UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   **NOV 1 4 2014**

RUBEN JUAREZ, on behalf of himself and all : others similarly situated,

              Plaintiff,

            -v-

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, INC.,

            Defendant.

-----------------------------------------------------------------X

14-cv-5107 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On July 9, 2014, plaintiff Ruben Juarez ("plaintiff" or "Juarez") filed this action, individually and on behalf of all others similarly situated, against The Northwestern Mutual Life Insurance Company, Inc. ("defendant" or "Northwestern Mutual"), alleging alienage discrimination in violation of 42 U.S.C. § 1981. (ECF No. 2 ("Compl.").) Plaintiff alleges that he was legally authorized to work in the United States, applied for a position at Northwestern Mutual, and was rejected pursuant to a policy that denies employment to all persons who are not U.S. citizens or legal permanent residents ("LPRs"). On September 4, 2014, defendant filed a motion to dismiss the Complaint for failure to state a claim. (ECF No. 22.) The motion became fully briefed on October 10, 2014 (ECF No. 40) and the Court heard oral argument on the motion on November 3, 2014. For the reasons set forth below, the motion is DENIED.

I.    BACKGROUND

The Complaint alleges the following facts.[1]  The Deferred Action for
Childhood Arrivals ("DACA") is a federal program that authorizes recipients to
remain in the United States for two years[2] and to obtain an Employment
Authorization Document ("EAD"), a federal work permit, and a Social Security
number.  (See Compl. ¶¶ 16-17.)  Juarez is a Mexican national residing in New
York.  (Id. ¶ 2.)  On October 25, 2012, Jaurez obtained DACA status.[3]  (Id. ¶ 20.)
Juarez obtained an EAD around the same time and received a Social Security
number on November 2, 2012.  (Id. ¶¶ 20-21.)

On October 26, 2012, Juarez submitted a resume to a Northwestern Mutual
representative who was recruiting college students to become interns.  (Id. ¶ 22.)
On December 11, 2013, Juarez interviewed at Northwestern Mutual with Susan
Lewandowski ("Lewandowski").  (Id. ¶ 25.)  After the interview, Lewandowski
requested Juarez's employment documents.  (Id. ¶ 26.)  Juarez provided his valid
Social Security number.  (Id.)  Lewandowski then asked Juarez whether he was a
U.S. citizen or a green-card holder.  (Id. ¶ 27.)  Juarez explained that he had DACA
status and an EAD and that he was legally authorized to work in the United States.
(Id.)  On December 17, 2013, Juarez e-mailed Lewandowski and informed her that,
based on his research, "he could legally work for Northwestern Mutual regardless of
whether he was a citizen or had a visa."  (Id. ¶ 29.)  Later that day, Lewandowski

---

[1] The Court sets out here only those facts that are relevant to defendant's motion to dismiss.

[2] Recipients may seek renewal of their DACA status for an additional two years.  (Compl. ¶ 16.)

[3] The Court has been advised that, on October 29, 2014, Juarez's DACA status was renewed for an
additional two years.  (See Defendant's Letter of November 7, 2014 at 3, ECF No. 42.)

2

replied, "[s]orry but you have to be a US citizen or have a green card." (Id. ¶ 30 (internal quotation marks omitted).) According to the Complaint, "Northwestern Mutual advertises its blanket ban against hiring anyone who is not a U.S. citizen or U.S. permanent resident on its website."[4] (Id. ¶ 31.)

On July 9, 2014, Juarez filed this putative class action against Northwestern Mutual, alleging alienage discrimination in violation of 42 U.S.C. § 1981. (ECF No. 2.) On September 4, 2014, defendant filed a motion to dismiss the Complaint for failure to state a claim. (ECF No. 22.) That motion is the subject of this Opinion & Order.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In applying that

---

[4] The specific policy alleged in the Complaint is as follows:

> Financial representatives must have at least three years of continuous U.S. residency, hold a permanent resident visa and read, write and speak English fluently. A financial representative intern must hold a current student or resident visa, have three years continuous residency or anticipated three years of continuous residency completed upon college graduation, and read, write and speak English fluently.

(Compl. ¶ 31.) For simplicity, the Court will describe the policy as requiring U.S. citizenship or legal permanent residency. For purposes of resolving the instant motion, the only important feature of the policy is that it denies employment opportunities to (and only to) a subclass of aliens.

3

standard, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in plaintiff's favor, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. (citing Twombly, 550 U.S. at 555).

B. Section 1981

Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The statute, as amended by the Civil Rights Act of 1991, prohibits both public and private actors from discriminating on the basis of race or alienage in the making and enforcement of contracts, including employment contracts. See Anderson v. Conboy, 156 F.3d 167, 170, 180 (2d Cir. 1998). Alienage discrimination is discrimination on the basis of citizenship. See, e.g., Anderson, 156 F.3d at 171 (observing that § 1981's "juxtaposition of 'persons' and 'citizens' suggests that it prohibits alienage discrimination" (emphasis added)); see also 8 U.S.C. § 1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States"). "Alienage discrimination is distinct from both national-origin and birthplace discrimination." Anderson, 156 F.3d at 171 n.5 (citation omitted).

To state a claim under § 1981, a plaintiff must allege that (1) he or she is a member of a protected class, (2) the defendant intentionally discriminated against him or her on the basis of membership in that protected class; and (3) the discrimination concerned one of § 1981's enumerated activities. See Brown v. City

4

of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000) (citation omitted).[5]  "[Section] 1981,
like the Equal Protection Clause, can be violated only by purposeful discrimination."
Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982).
Purposeful discrimination is "conduct motivated by a discriminatory purpose,"
rather than conduct that "merely result[s] in a disproportionate impact on a
particular class." Id. at 386; see also id. at 388 (quoting a case for the proposition
that § 1981 would be violated if a private actor discriminated against someone
"solely because" of his race).

     C.     Relationship Between § 1981 and the Fourteenth Amendment

     There is a close relationship between § 1981 and the Fourteenth Amendment.
Section 1981 is derived from Section 1 of the Civil Rights Act of 1866 and Section 16
of the Voting Rights Act of 1870. Anderson, 156 F.3d at 172. "Both of these laws, in
turn, were legislative cousins of the Fourteenth Amendment":

> The 1866 Act represented Congress' first attempt to ensure equal rights for
> the freedmen following the formal abolition of slavery effected by the
> Thirteenth Amendment. As such, it constituted an initial blueprint of the
> Fourteenth Amendment, which Congress proposed in part as a means of
> "incorporat[ing] the guaranties of the Civil Rights Act of 1866 in the organic
> law of the land." The 1870 Act, which contained the language that now
> appears in § 1981, was enacted as a means of enforcing the recently ratified
> Fourteenth Amendment.

Gen. Bldg. Contractors, 458 U.S. at 389 (citations omitted).  "In light of the close
connection between these Acts and the Amendment, it would be incongruous to
construe the principal object of their successor, § 1981, in a manner markedly

---

[5] Brown addressed discrimination on the basis of race, but Anderson held that alienage is also a
protected characteristic under § 1981.  See Anderson, 156 F.3d at 180.

different from that of the Amendment itself." Id. at 389-90.  In particular,

"purposeful discrimination that violates the Equal Protection Clause of the

Fourteenth Amendment will also violate § 1981." Gratz v. Bollinger, 539 U.S. 244,

276 n.23 (2003) (citing Gen. Bldg. Contractors, 458 U.S. at 389-90).  The pleading

standards for two claims are also the same.  See Brisbane v. Milano, 443 F. App'x

593, 594 (2d Cir. 2011) (citation omitted).

III.    DISCUSSION

     A.    Defendant's argument

     Defendant does not dispute that the Complaint sufficiently alleges the first

and third elements required to state a claim under § 1981—namely, that plaintiff

was a member of a protected class and that the alleged discrimination concerned

one of § 1981's enumerated activities.  Rather, defendant argues that the Complaint

fails because it does not (and cannot) plausibly allege that Northwestern Mutual

engaged in intentional, purposeful discrimination on the basis of alienage.  (See

Defendant's Memorandum of Law in Support of Its Motion to Dismiss ("Def.'s

Mem.") at 1, ECF No. 23.)  Defendant cites Iqbal for the meaning of "discriminatory

purpose":

> Under extant precedent purposeful discrimination requires more than "intent
> as volition or intent as awareness of consequences."  It instead involves a
> decisionmaker's undertaking a course of action "'because of,' not merely 'in
> spite of,' [the action's] adverse effects upon an identifiable group."

Iqbal, 556 U.S. at 676-77 (citations omitted).  According to defendant, Northwestern

Mutual's willingness to hire LPRs—"the single largest group of non-U.S. citizens

who are authorized to work in the United States"—renders implausible any

6

allegation that the company refused to hire Juarez "because of" his lack of U.S.
citizenship. (Def.'s Mem. at 1; see also id. at 15 ("[The] Complaint acknowledges
that if he had held a green card, Juarez would have been welcome to apply for a
contract notwithstanding his lack of United States citizenship."); 11/3/14 Tr.[6] at 11
("[The policy] clearly couldn't be driven by a motive, an intent, purposeful
discrimination against someone because of their lack of citizenship, or they would
have excluded all of them.").) According to defendant, the Complaint at most
plausibly alleges that Juarez was turned away because of his work authorization or
immigration status (that is, his lack of a green card)—a classification that does not
fall within the ambit of § 1981. (See Def.'s Mem. at 4; 11/3/14 Tr. at 19 ("Mr. Juarez
was not turned away because he was not a citizen. He was turned away because he
didn't have a green card . . . .").) Relatedly, defendant argues that Juarez has not
pled "specific facts giving rise to a reasonable inference of discriminatory animus
and purpose" (Def.'s Mem. at 14), as required to state a claim under § 1981. (Id. at
14-15.)

B.    The Court's Analysis

The policy alleged in the Complaint—essentially, "Legal aliens without green
cards need not apply"—on its face discriminates against a subclass of lawfully
present aliens. Juarez's allegations that he was denied employment pursuant this
policy are sufficient to state a claim under § 1981. This conclusion follows directly
from three premises, each of which is well supported in the law: (1) § 1981's

---

[6] Citations to "11/3/14 Tr." refer to the transcript of the oral argument held on November 3, 2014.

protection against discrimination extends to <u>all</u> lawfully present[7] aliens, whether or not they have a green card; (2) a plaintiff need not allege discrimination against <u>all</u> members of a protected class to state a claim under § 1981; and (3) a plaintiff can plead intentional discrimination by alleging that the defendant acted pursuant to a facially discriminatory policy requiring adverse treatment based on a protected trait. The Court elaborates on each of these premises in turn.

The protection of § 1981, like that of the Fourteenth Amendment, extends to all lawfully present aliens, whether or not they have a green card. <u>See</u> 42 U.S.C. § 1981 ("<u>All persons within the jurisdiction of the United States</u> shall have the same right . . . ." (emphasis added)); <u>Anderson</u>, 156 F.3d at 173-74 (explaining that "any prohibition against alienage discrimination [in § 1981] must be derived from Section 16 of the 1870 Act," <u>id.</u> at 173, and later concluding that "Section 16 was to apply to all aliens," <u>id.</u> at 174); <u>see also</u> <u>Torao Takahashi v. Fish & Game Comm'n</u>, 334 U.S. 410, 419-20 (1948) ("The protection of [§ 1981 (then codified at 8 U.S.C. § 41)] has been held to extend to aliens as well as to citizens. . . . The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that <u>all</u> <u>persons lawfully in this country</u> shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." (emphasis added) (footnote omitted)). Indeed, defendant does not dispute that all lawfully present

---

[7] The Court need not address the extent, if any, to which § 1981's protection against discrimination extends to illegal or undocumented aliens.

aliens, including those who do not hold green cards, are protected under § 1981. (See 11/3/14 Tr. at 15.)

Defendant also does not dispute that a plaintiff need not allege discrimination against all members of a protected class to state a claim under § 1981. (See Reply Brief in Support of Northwestern Mutual's Motion to Dismiss at 2-3 (acknowledging that the "observation that a principal cannot escape liability for unlawful discrimination against one member of a protected class merely by establishing that it did not discriminate against every member of that protected class" is "unremarkable" and "undisputed"), ECF No. 40.) In Brown v. Henderson, the Second Circuit explored this issue in the context of a Title VII claim of sex discrimination by virtue of a hostile work environment. See 257 F.3d 246, 252-55 (2d Cir. 2001). Like Juarez, the plaintiff in Brown was required to show that the challenged conduct occurred "because of" her protected characteristic. Id. at 252. Although ultimately concluding that the plaintiff could not show that she was discriminated against because of her sex,[8] id. at 256, the Second Circuit rejected the defendant's argument that "there could be no discrimination 'because of sex' where both a woman ([the plaintiff]) and a man . . . were harassed," id. at 252. The Court explained that "discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex." Id. (citations omitted). Similarly, "whether an employer discriminates against only a subset of a protected class or discriminates inconsistently, Title VII

---

[8] Unlike this case, Brown did not involve a facially discriminatory policy.

9

nevertheless protects any individual so long as that individual is mistreated because of her sex." Id. at 253 (citations omitted). The same principles apply to § 1981 claims. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) (quoting a case for the proposition that "[i]n analyzing § 1981 claims, we apply the same standards as in Title VII cases" (quoting Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 347 n.2 (7th Cir. 1999)) (internal quotation marks omitted)). A defendant is not insulated from § 1981 liability for intentional discrimination against some members of a protected class merely because not every member of the class becomes a victim of the discrimination.[9]

Finally, while defendant is correct that "§ 1981 reaches only purposeful discrimination," Gen. Bldg. Contractors, 458 U.S. at 389, a plaintiff who alleges a policy that is discriminatory on its face is not required to make any further allegations of discriminatory intent or animus. The Second Circuit has explained that there are "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause," Brown, 221 F.3d at 337, and that the same pleadings standards apply to § 1981 claims, id. at 339. One of the ways to plead intentional discrimination is to point to a law or policy that expressly classifies people on the basis of a protected characteristic. Id. at 337; see also Hazen Paper

---

[9] Put differently, a plaintiff can state a claim under § 1981 by alleging that defendant imposed an additional burden on a protected class, even if some members of the class are able to overcome that burden. See Joseph v. New York Yankees P'ship, No. 00 Civ. 2275 (SHS), 2000 WL 1559019, at *3 (S.D.N.Y. Oct. 19, 2000) ("Assuming [the plaintiff's] allegations are true and that she was required to fulfill an additional condition that non-minority customers were not before she could contract for dining services, she would be limited in her right to contract as she could not enjoy 'all benefits, privileges, terms, and conditions of the contractual relationship' to the same extent as non-minority customers." (citing 42 U.S.C. § 1981)).

Co. v. Biggins, 507 U.S. 604, 610 (1993) ("The employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with [a protected] trait." (citations omitted)); Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006) ("[P]roof of 'a facially discriminatory employment policy . . . to [avoid hiring] employees in the protected group is direct evidence of discriminatory intent.'" (citations omitted)). It follows that allegations that Juarez's application was rejected pursuant to a policy that expressly denies employment to lawfully present aliens without green cards—a protected subclass—suffice to state a claim under § 1981.

Defendant misinterprets the law when it argues that Northwestern Mutual's willingness to hire some lawfully present aliens renders implausible any allegation of intentional discrimination on the basis of alienage. Iqbal's statement that purposeful discrimination requires that the adverse action be taken "because of" rather than "in spite of" a protected characteristic, see 556 U.S. at 676-77, is consistent with the principle that one of the ways to engage in purposeful discrimination is to apply a policy that is discriminatory on its face. Facial discrimination is discrimination "because of" a protected characteristic. An employer cannot implement a policy, "Members of protected class P need not apply," and then successfully argue that the policy was not motivated by any animus toward the protected class. Similarly, the employer cannot implement a policy that expressly discriminates against members of a protected class (here, lawfully present aliens) with characteristic X (here, lack of LPR status) and then, when a rejected

11

candidate files a lawsuit, successfully argue that case should be dismissed because the discrimination was on the basis of X rather than the protected trait. Such an argument fails at pleadings stage irrespective of the nature of characteristic X: X could be a particular eye color ("Aliens with blue eyes need not apply") or X could be, as here, a particular immigration status ("Aliens without LPR status need not apply").[10] The important point is that the alleged policy facially singles out a protected subclass for adverse treatment.

Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993), does not support defendant's position. In Biggins, the Supreme Court held that an employer does not violate the Age Discrimination in Employment Act of 1967 ("ADEA") "just by interfering with an older employee's pension benefits that would have vested by virtue of the employee's years of service." Id. at 613. The Court explained that discrimination on the basis of years of service does not run afoul of the ADEA because "an employee's age is analytically distinct from his years of service":

> An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, see 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

Id. at 611. Unlike in Biggins, where the classification was on the basis of a characteristic (years of service) that was merely correlated with a protected trait

---

[10] There is no question that an employer may have good business reasons to refuse to hire aliens who are not LPRs—reasons that would not justify discriminating on the basis of eye color. However, any such reasons are irrelevant to the present motion.

(age), the classification alleged here is expressly based on a protected trait: the alleged policy singles out a subclass of aliens, namely those without green cards, and denies them employment. A <u>Biggins</u>-like analogue would be a policy that discriminates against employees over 50 with Y years of service.[11]

## C. Equal Protection Cases

The conclusion that Juarez has stated a plausible claim under § 1981 is supported by a long line of precedent interpreting the Equal Protection Clause.[12] In

---

[11] Defendant's reliance on <u>Vaughn v. City of New York</u>, No. 06-CV-6547 (ILG), 2010 WL 2076926 (E.D.N.Y. May 24, 2010), is also misplaced. In stating that "alienage discrimination is discrimination on the basis of citizenship status, not immigrant status," <u>id.</u> at *10, <u>Vaughn</u> was distinguishing between alienage discrimination and national origin discrimination. <u>See id.</u> (citing cases for the proposition that § 1981 does not prohibit national origin discrimination). Here, there is no question that the alleged policy classifies people on the basis of alienage rather than national origin.

    Finally, <u>Talwar v. Staten Island Univ. Hosp.</u>, No. 12-CV-0033 (CBA)(JMA), 2014 WL 5784626 (E.D.N.Y. Mar. 31, 2014), which is currently on appeal before the Second Circuit, is distinguishable from this case. In <u>Talwar</u>, the plaintiff argued that her employer violated § 1981 by insisting that she obtain an unlimited medical license, which was available only to citizens and LPRs. <u>See id.</u> at *7. Importantly, the employer did not impose this requirement on Dr. Talwar until after she complained about her salary. The district court found that the plaintiff's own testimony on this point undercut any inference that her employer discriminated against her because she was an alien:

> Here, . . . any [inference of discrimination on the basis of alienage] is entirely undercut by the fact that Dr. Talwar's own testimony establishes that Dr. Simpkins took these actions only after she complained about her salary. Given her long and amicable relationship with Dr. Simpkins, Dr. Talwar acknowledges that Dr. Simpkins did not "suddenly develop a dislike" for her because she was not a citizen. Instead, Dr. Talwar testified at her deposition that she believed the revision of her employment contract and the scrutiny of her citizenship status were a "cover" in order to retaliate against her for her complaints about a pay disparity. In other words, under Dr. Talwar's own theory of the facts, defendants' sudden insistence that she obtain an unlimited medical license was pretext for her complaints to Dr. Simpkins about her salary.

<u>Id.</u> (citations omitted). Unlike the employer in <u>Talwar</u>, Northwestern Mutual allegedly rejected plaintiff's application pursuant to a policy that expressly denied employment to a subset of aliens. As explained above, the allegation of a facially discriminatory policy—an allegation not made in <u>Talwar</u>—obviates the need for additional allegations of discriminatory intent or animus behind the alleged adverse action.

[12] Although these cases were not decided on a motion to dismiss, they are relevant because they suggest that the policy alleged in Juarez's Complaint runs afoul of § 1981. <u>See Gen. Bldg. Contractors</u>, 458 U.S. at 389-90 ("In light of the close connection between these Acts and the

Torao Takahashi, the Supreme Court struck down[13] a California statute that denied

commercial fishing licenses to any "person ineligible [for] citizenship," 334 U.S. at

413 (internal quotation marks omitted), explaining that "[s]tate laws which impose

discriminatory burdens upon the entrance or residence of aliens lawfully within the

United States" are invalid, id. at 419. Then, in Graham v. Richardson, the Supreme

Court struck down two state statutes that prevented immigrants from receiving

public assistance. 403 U.S. 365, 376 (1971). Notably, neither statute denied

benefits to all aliens: one barred aliens who did not qualify under federal assistance

programs, and the second barred aliens who did not satisfy a fifteen-year residency

requirement. See id. at 367-68. Nonetheless, the Court subjected both statutes to

strict scrutiny and held that they violated the Equal Protection Clause. Id. at 376.

Since Graham, the Court has repeatedly applied strict scrutiny to statutes

discriminating on the basis of alienage.[14] See Dandamudi, 686 F.3d at 73 (collecting

cases). In Nyquist v. Mauclet, resident aliens challenged the constitutionality a

New York statutory provision barring certain resident aliens from receiving state

financial assistance for higher education. See 432 U.S. 1, 3-5 (1977). The statutory

provision provided:

---

Amendment, it would be incongruous to construe the principal object of their successor, § 1981, in a manner markedly different from that of the Amendment itself.").

[13] As the Second Circuit has observed, "the basis for the decision was unclear, appearing to rely on both the Equal Protection Clause of the Fourteenth Amendment and Congress's exclusive power under Article I to control immigration." Anderson, 156 F.3d at 177 (citation omitted).

[14] The Court has recognized two exceptions, neither of which is relevant here. The first exception is that states' exclusion of aliens from political and governmental functions is subject to only rational-basis review. Dandamudi v. Tisch, 686 F.3d 66, 73 (2d Cir. 2012). The second exception allows states more latitude to deny opportunities and benefits to undocumented aliens. Id. at 74.

Citizenship. An applicant (a) must be a citizen of the United States, or (b) must have made application to become a citizen, or (c) if not qualified for citizenship, must submit a statement affirming intent to apply for United States citizenship as soon as he has the qualifications, and must apply as soon as eligible for citizenship, or (d) must be an individual of a class of refugees paroled by the attorney general of the United States under his parole authority pertaining to the admission of aliens to the United States.

Id. at 3-4. The district court held that this provision violated the Equal Protection Clause by discriminating against resident aliens. Id. at 5-6. On appeal, the defendants argued, inter alia, that the provision should not be subjected to strict scrutiny, id. at 7, because it distinguished "only within the 'heterogeneous' class of aliens," not "between citizens and aliens vel non": "[a]liens who have applied for citizenship, or, if not qualified for it, who have filed a statement of intent to apply as soon as they are eligible, are allowed to participate in the assistance programs," id. at 8 (internal quotation marks omitted). The Supreme Court, citing Graham, squarely rejected this argument, explaining that "[t]he important points are that [the provision] is directed at aliens and that only aliens are harmed by it. The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class." Id. at 9 (citations omitted). The Court struck down the provision as unconstitutional. Id. at 12.

The Second Circuit also has affirmed the principle that discrimination against a subclass of aliens is subject to strict scrutiny. In Dandamudi, nonimmigrant aliens[15] who had temporary authorization from the federal

---

[15] "Nonimmigrant" aliens are aliens whose "status grants them the right to reside and work in the United States only temporarily." Dandamudi, 686 F.3d at 70.

government to work in the United States challenged the constitutionality of a New York licensing statute that provided that only U.S. citizens and LPRs were eligible for a pharmacist's license.  686 F.3d at 69-70.  The district court granted plaintiffs' motion for summary judgment, and the Second Circuit affirmed.  Id. at 70.  The Second Circuit rejected the state's argument that the statute should be subjected to rational-basis review because it discriminates against only against nonimmigrant aliens: "In our view, . . . a state statute that discriminates against aliens who have been lawfully admitted to reside and work in the United States should be viewed in the same light under the Equal Protection Clause as one which discriminates against aliens who enjoy the right to reside here permanently."[16]  Id.; see also id. at 74-75 ("[T]he [Supreme] Court has never distinguished between classes of legal resident aliens.  The state's argument that suspect class protection extends no further than to LPRs simply has no mooring in the High Court's prior ventures into this area." (footnote omitted)); id. at 76-77 ("Nothing in the Supreme Court's precedent counsels us to 'judicially craft[] a subset of aliens, scaled by how [we] perceive the aliens' proximity to citizenship.'  Rather, the Court's precedent supports drawing a distinction among aliens only as between lawfully admitted aliens and those who are in the United States illegally." (footnotes and citations omitted)).

---

[16] In so holding, the Second Circuit disagreed with two contrary decisions in the Fifth and Sixth Circuits.  See id. at 72, 75.

16

In these cases, statutes that discriminated against a subclass of lawfully present aliens were subjected to strict scrutiny and struck down as violating the Equal Protection Clause.  As in these cases, the policy alleged here is "is directed at aliens and that only aliens are harmed by it," <u>Nyquist</u>, 432 U.S. at 9.  Given the close connection between § 1981 and the Equal Protection Clause, <u>Gen. Bldg. Contractors</u>, 458 U.S. at 389-90, these cases suggest that Juarez's allegations, if proven, would establish a violation of § 1981.  <u>See</u> <u>Gratz</u>, 539 U.S. at 276 n.23 ("[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981.").

IV.    CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 22.

SO ORDERED.

Dated:      New York, New York
            November 14, 2014

_____
KATHERINE B. FORREST
United States District Judge